Mr. G.C. came to the United States when he was about 15 years old. His children and wife are U.S. citizens. The agency denied Mr. G.C.'s application for deferral of removal under the Convention Against Torture, and I'd like to focus on three major errors in that decision. First, the agency's finding that Mr. G.C. would not be tortured by the Salvadoran state because he's not a gang member. Second, the agency's finding that Mr. G.C. would not be the Salvadoran government would not acquiesce in Mr. G.C.'s torture by gang members. And third, the agency's failure to aggregate Mr. G.C.'s risk of torture from all sources and for all reasons. So turning to the first error, the agency found that Mr. G.C. would not be tortured by the Salvadoran state because he's not a gang member. The Board cited Acknowledged Country Conditions evidence that shows that people who are U.S. deportees, have U.S. criminal convictions, and have tattoos are targeted by the Salvadoran government, but found that that did not amount to individualized evidence that Mr. G.C. would be tortured by the state. And that's very clear in our case law, is it not? It's very clear in our case law that, in this Court's case law, that Country Conditions evidence alone can meet an applicant's burden under CAT, and that membership in a disfavored group that suffers widespread human rights abuses is strong evidence that a petitioner will be tortured. And I respect your good law. You want to advocate for your client. But as you can appreciate, we get lots and lots of claims that sound very much like what you're talking about here. And the burden is on you to show that there was not substantial evidence before the I.J. to determine that there is no individualized threat to your client. What's your best argument, aside from the Country Conditions, which, Frank, don't carry much water with most of us, what's your best argument that your client is individually threatened with no help, basically, from the state, and need acquiescence in torture? So I don't think you can separate out the Country Conditions evidence in this case. So you're relying entirely on Country Conditions? We are not. So Mr. G.C. has these characteristics. That's not in dispute. I understand that. But what — it's all speculation, basically, right? Most of the time when we have cases that they can show government acquiescence, there's either been an unwillingness of the police or others to help them when they needed help before or being directly involved in prior torture. There's nothing like that here. What can you point to that would show that the substantial evidence that the I.J. claims is, in effect, insufficient and, indeed, bogus? So, yes, I think trying — thinking about how to answer your question, we believe there are legal errors here that warrant reversal, but also that substantial evidence does show that Mr. G.C. would be tortured. So the regulations in this Court's case law require that all evidence be considered. Here, Mr. G.C. himself was held at gunpoint by gang members the last time he was in El Salvador. He believed — he was held at point-blank range and believed he was about to be shot. He also — the gang subsequently followed him and threatened him where he was staying at his family's home to turn him over or pay them. He also has many family members who have been killed or targeted by gangs, including his brother. These are — and, again, horrible situation. I get that. But these are criminal elements. This is not the government. You haven't proved that the government's directly involved in this. You're talking about criminal elements. We don't grant relief based upon somebody that's targeted for a criminal purpose. So what are you relying on here? So I think there's two parts in there. One is where we believe the agency was wrong in finding he's not a gang member. So the evidence in the record shows, which includes country conditions evidence and Mr. G.C.'s credible testimony, that the Salvadoran government — there's been a sea change in El Salvador. The Salvadoran government has imposed the state of exception in 2022, which it has used to suspend due process rights. It holds hearings en masse. It targets people who are not gang members and especially at heightened risk, including in Dr. McNamara's expert declaration talks about how people with these three characteristics I've mentioned — so people with tattoos, U.S. deportees, and people with U.S. criminal convictions — are at heightened risk. So your argument is that everybody in the country that has those situations is eligible for CAP? The evidence does suggest that people with any one of those characteristics is at heightened risk under the state of exception. However, here Mr. G.C. has those three overlapping characteristics that put him at risk. He has also been — he has been misidentified as a gang member the last time he was in El Salvador and is likely — that is likely to happen again. And then I think also here, even if this Court does not find that the evidence compels the conclusion, which we feel that it does, that he is entitled to CAP relief, he has shown his eligibility, the agency was still required to give reasoned consideration to the evidence in the record and failed to do so here. So that's a legal error that must be reversed. Can I ask a question? I heard you challenging that he — you know, the BIA found he's not a gang member and he did not — and he did not have gang-related tattoos. You're challenging that factual finding? You're saying he is a gang member? No. We are — he is not a gang member. He has never been a gang member. He doesn't have gang-related tattoos, right? Correct. He's — yeah. He didn't get any of his tattoos because of any gang membership. Our contention is that the agency erred in saying that that is — that would protect him. The fact that he's not actually a gang member would protect him from harm in El Salvador. The evidence overwhelmingly shows, including in the Department of State's Human Rights Report, talks about how people are targeted under the state of exception and tortured and intentionally — But I thought the whole point of the state of exception is they're targeting gang members. They're sweeping up a bunch of people who aren't gang members. So the state of exception is designed as a crackdown on gangs. It happened — the Bukele administration actually had, like, an informal pact that's explained in both the Department of State report and Dr. McNamara's declaration and elsewhere that fell apart with the gangs, and then they imposed the state of exception. Doesn't that cut against you because it suggests that the Salvadoran government can protect people in the situation your client's in? And what I hear you saying is, well, he's at risk of being misidentified and swept into the system. But that just — that seems like a too gentle a proposition to carry the day here. Yeah. The evidence is quite, I think, overwhelming and does show this point, even though it seems — it's a very — it's an exceptional state, right? It's the state of exception. It's a very extreme situation. It is interesting in that way that the government does have this state of exception aimed at gang members. That's kind of, like, what they say they're doing. But I think the record belies that they're actually — that's focused on gang members. They — gang violence continues to run rampant in El Salvador. Disappearances are up. Although I think — I thought — I don't know if this is in the record, but I thought actually crime has gone down in El Salvador because of the state of exception. The confirmed homicide rate has certainly gone down, and Dr. McNamara discusses that. One of the things he points out is that disappearances have actually increased. And I think even though it was before the state of exception, I think one thing that kind of highlights why that might be happening is that the government entered into negotiations with the — which is still the current government — with the gangs in order to reduce the confirmed homicide rate to give a political benefit to the Bukele administration, even while gangs were continuing to authorize murders in which a body would not be found. And even there's a Department of State indictment against gang leaders in the record that talks about — like, the U.S. Department of State has noted this. Yeah. I mean, really, this — it does all seem kind of to count against you because it sounds like El Salvador is doing everything they can to protect its citizenry from non-gang — from gang members, which includes your client. So how is it — how are they acquiescing to his torture? We don't believe it includes our client. The record shows that our client, as with these characteristics that he has, that he would be swept up under this state of exception. I think Dr. McNamara states that only 5 percent of the people — of, like, the 70,000, at the time that this record was created, people have been confirmed as gang members. And then once people are swept up by the government, they're imprisoned. They're — he would be mixed with gang members. Prison is intentionally torturous. Bukele ordered mattresses removed. People have had to eat food off the floor. What about his specific characteristics that — and shows that he would be swept up accidentally? I don't think it would be accidentally. I think the record shows that people are intentionally targeted when they have tattoos, when they — U.S. deportees and people with U.S. credentials. It's in the record that the government sweeps up people with non-gang tattoos? Yes. And also, I think — Do you know where that is? Is that in the country report or — I believe it is in the country report. It's in trying to collect sites. There are so many. I think at our opening brief — so, yeah, the section talking about him being targeted, even though he's not a gang member, is in our opening brief at 24 to 31. Him being a U.S. deportee with U.S. criminal convictions, he is also at much higher risk than other people in El Salvador with tattoos because the U.S. government shares criminal conviction information with the Salvadoran government. And Dr. McNamara states that he'd almost be certainly to be upon removal. Counsel, let me ask you this. I, personally, have probably heard 10 substantially identical cases from El Salvador in the last two years. Have you got things other than Kat that you want to talk to us about? I think we have your position in mind on Kat. What's your next best argument for your client? So, I think I'd go to the other legal errors in this case. What's the most important one from your perspective? Okay. So, I'm happy to — I think I'd go to the admission of the expert declaration. I'm also happy to talk about any — I see I have limited time. Take the expert declaration. Okay. The I.J. clearly considered it, right? We don't believe the I.J. gave it reasoned consideration. He did admit it as background country conditions evidence. Referred to it, right? He called it relevant and probative information, and he did pull some facts from it in his decision. But he did not explain — so, he both said it was probative and relevant, and then he didn't explain how he reached an opposite conclusion from the report. Have to? We do believe — so, expert evidence does — under Castillo v. Barr, this Court has held that the agency should explain when it reaches a different conclusion than expert evidence why that didn't meet a Petitioner's plan. You think that case says that? We do think that it supports that the board must explain why expert evidence is insufficient.  The board also has a case, a matter of — In this case, the — you know, he didn't think it was an expert that qualified, but he did refer to his report, and he did, if you will, include it in the analysis. That's pretty good for you that that got included. You're suggesting that unless the I.J. referred to every portion of the report and disagreed with what he didn't agree with, it's faulty. Is that what you're saying? No, but the immigration judge doesn't have to explain or even, you know, reference every piece of evidence in the record, but this was highly potentially dispositive evidence, and for the judge to pull facts that supported his conclusion — Judges have to be the ultimate fact-finders. They can't rely just on an expert. That's not the role of the expert. They take the expert's information, weigh it in their consideration. That's all that's required at best, right? We believe that the — I see I'm running low on time, but — I see. We believe that the immigration judge's decision and the board's decision does not evidence reasoned consideration of this declaration. You want to save the balance of your time? Yes, thank you. Very well. Let's hear from Ms. McKinney for the government. Good morning. Good morning, and may it please the Court. My name is Catherine McKinney, and I represent the Attorney General Merrick Garland in this matter. Your Honors, this Court should deny the petition for review. Substantial record evidence supports the agency's determination that the Petitioner's evidence fell short of establishing his eligibility for CAT deferral based on his fear of harm from gangs and from the Salvadoran government. The Petitioner did not allege any past harm from Salvadoran public officials, and the threats and extortion he experienced from gangs in the past did not rise to the level of past torture, nor has Petitioner shown that he more likely than not faces torture upon return to his homeland from gangs or the Salvadoran government due to his status as a deportee with a criminal history and tattoos. As the agency noted, the Petitioner in this case has never been a gang member, does not have any gang-related tattoos, or a gang-related criminal history. And these facts weigh against the likelihood that he would face torture in El Salvador were he to be returned. So the government's position is that substantial record evidence supports the immigration judge and the Board's conclusion that he didn't meet his burden of proof. With respect to— Counsel, can I ask, is there any evidence in the record that shows that El Salvador targets non-gang members with tattoos? I'm not—I think that in Dr. McNamara's report, which was admitted as background evidence, not as an export report, there's some reference to individuals being swept up there. And I think the Board, if we look at the Board's decision in the record on page 5, acknowledges that the Petitioner submitted some country conditions evidence that some individuals were targeted even though they have non-gang-related histories and individuals with non-gang-related tattoos. And that's at page 5 of the Board's decision. I'm sorry, page 5 of the record. So I think the Board seems to acknowledge that there's some background evidence there. But the background evidence that some individuals without a gang-related history or gang-related tattoos have perhaps been swept up does not in and of itself meet the Petitioner's burden in this case. That's what both the judge and the Board found. And the record here before this Court doesn't compel a contrary conclusion based on that background country conditions evidence. Turning to the Petitioner— Did he say who was getting swept up, or is it just generalized swept up? And again, there was a lot of background information. Yes, I know. I cannot say for certain that it was specifically Your Honor's question about individuals with tattoos that didn't happen to be gang-related. I can't speak specifically to that. But the Board seems to acknowledge that there was some background evidence that people without this history had been swept up, but that that didn't meet his burden in this case of showing and his — meeting his burden. So the record evidence supports the agency's determination that he didn't meet his conclusion. Turning to his second contention was that the agency's analysis here was not adequate on the cat deferral issue, and that refers to the aggregation requirement. This Court has said that the agency has to consider potential sources of torture in the aggregate when a Petitioner raises multiple theories. And in this case, we had multiple theories. And it's the government's response, as we noted in our brief, that here the agency said enough and that the language used here was similar to that used in Iraheta, Martinez, and that's cited in the government's brief. And there, even though it wasn't a specific adoption of an immigration decision citing Bourbano, what the agency did was said that we as the Board agree with the immigration judge. And they used strikingly similar language to that used in Iraheta is what's used here, where they say we discern no error in the judge's determination that he didn't establish that he more likely than not would be tortured. And in the Iraheta decision, it was very similar. We discern no error in the judge's finding that he has not shown he would more likely than not face torture. And then, as in Iraheta, what the Board is doing is responding to the arguments raised on appeal. The Board's an appellate body. The Board responds to the arguments raised on appeal. But they're still expressing their agreement with the immigration judge. And the immigration judge here explicitly conducted an aggregation analysis. So it's the government's argument that there's enough here and that it's closer to Iraheta. And I know that in the reply to the record that might suggest that if an individual is mistakenly swept up because of these identifying characteristics that, you know, you're in this Kafkaesque limbo in prison or, and I've seen the photos. Is there any suggestion in the record that there is a process where mistakes can be corrected, some kind of review or judicial tribunal? And I do believe that in Dr. McNamara's declaration, which was admitted as background evidence, I'm not 100 percent, but I do believe that there was reference there to individuals who were eventually released and how long a period of time. So that would imply, then, that there was at least some process or that some individual who might be mistakenly swept up. But the agency, again, this Court looks at the facts that the agency cited. And I know that in the immigration judge and the Board's decision, their response to that argument was, we acknowledge some of this background country conditions evidence, but you haven't met your burden here in this case to show an individualized risk of torture. And that was the agency's response to that. So I think I found the McNamara decision part where he says that authorities are especially keen to arrest supposedly suspected gang members, individuals who have tattoos, criminal history, and or are deportees from the United States, even where there's no evidence at all linking an individual to current gang membership. And it also says other individuals have been arrested during the state of emergency for simply having tattoos. So why is that not enough to show a particularized risk of being tortured or being swept up in this? So that there may be background evidence in the record, as the agency acknowledges of that. But an individual still has the burden of showing that they more likely than not face an individualized risk of torture in that case. Or the agency found. And perhaps on a different set of facts, on a different record, different fact pattern here, because here we also had the testimony that he had no gang-related history, was not a gang member, no gang-related tattoos. Perhaps on a different record, the agency might find differently. But here the question is, does that evidence compel the conclusion? And it's the government's position that it does not. And I just wanted to make one point. Just because it's speculative to say that he'd be swept up just because he has similar characteristics? And it is speculative to say that you would be swept up. And that actually leads directly to what I was about to get to. In the reply brief, the Petitioner argues that it's inappropriate for the Board to have said your evidence is speculative, citing the JRF case. A Petitioner can't rely on speculative evidence to meet each item in the chain of events to meet your burden of proof. And the argument there from I believe it's Velazquez-Semilloa is that it's inappropriate when conducting an aggregate analysis to cite that JFF case. At least that's what the Court said in Velazquez. So it's the government's position that this case is closer to Iraheta, and that in Velazquez, the other panel of this Court didn't say that the agency could never cite to JFF in a case when there's multiple theories. What they said was that in that case, it was inadequate to show that the agency had engaged in a proper analysis and aggregated the risk. And it's apparent from that decision that it's — that the Court was not saying it's never appropriate to cite that because they're distinguishing another case from this Court where a panel of this Court did the same thing in Medina-Rodriguez. And what the Court in Velazquez said was it's okay that the Court in Medina cited to JFF and said that because there it was apparent that the appropriate aggregation occurred because under one of the theories, we found no risk, and then we cited the hypothetical chain of events case law for the second. And then we know that the appropriate aggregation occurred, and it's the government's position here. We know the appropriate aggregation occurred because the immigration judge was citing its agreement with the judge who conducted it and then addressing the arguments raised in the appeal. So that's why we think that's distinguishable.   Ultimately, it gets down to the difficult burden that the McNamara declaration as background must compel a finding that there's no substantial evidence on the government's part. Speculative versus actual, is that basically your position? I agree with that, that here it basically boils down to does the evidence, which includes all the background evidence in this case, and there was a lot, does that evidence compel the conclusion that he met his burden of proof? And it's the government position that he didn't. And with respect to the treatment of the declaration in this case, it's the government's position that an immigration judge has broad discretion on admitting and considering evidence, and as we cited in our brief, the Board has issued some guidance there in matter of MAMZ, and there what the Board said was that judges have discretion to admit and consider evidence, and that's what the judge did here. And there's no bright-line rule that the opposing party should have the opportunity to cross-examine an expert before it's admitted, but certainly the practice manual generally indicates that that should happen. So it wasn't an abuse of discretion here for the judge to say because that didn't happen in this case, the government didn't have an opportunity to cross-examine the expert. I'm not admitting it as expert testimony, but I'm still admitting it, and I'm still considering it as background evidence. And then per matter of MAMZ, the weight to be afforded that evidence is, again, up to the immigration judge. And then turning as to whether or not the judge here clearly considered the report, he mentions the report both at the beginning of decision and in his discussion of Catt, and he also says that I've considered all the evidence, whether or not I've explicitly discussed every single fact in that. And then the final point with respect to Dr. McNamara's opinion, there's a difference here because here what the Court is looking at is the agency's predictive findings, what is more likely than not to happen to this individual if they're returned to their homeland. And the Board has said in a matter of MAMZ, speaking specifically with regard to test expert testimony, it's still up to the trier fact, the judge in this case, to make those fact findings. And the judge can weigh the evidence and doesn't have to accept the factual findings, the opinions of the expert, even when the evidence is admitted as expert testimony. And here, of course, it was admitted as background evidence. So if the Court has no further questions, the government would rest on the brief.  Thank you. Very well, thank you. Thank you. All right. Ms. Walley, you have some rebuttal time. Thank you, Your Honor. So going to the question about where the record supports that people would be swept up if they're not actually gang members, our brief does have more extensive sites, but I just wanted to provide the one from the United States Department of State's Human Rights Report. So I think it's in the record twice, but on 496, it talks about how security forces frequently arrest persons for gang memberships based solely on anonymous denunciations, having tattoos, having any prior contact with the criminal justice system, or even just a suspicious appearance. But so there are a lot of people being targeted. But I think Mr. G.C.'s characteristics, it's well supported in the record. And it compels the conclusion that with his characteristics, he would be detained at the airport and then swept up under the state of... What about my question that the air might be corrected? There's some process for correction of the air by the El Salvadoran authorities? I might have missed that question. I'm sorry, that there might actually, for the accidental detainee, there might be a way within the system for him to get released. Unfortunately, the country conditions show that the government is, I think there's a line, I forget where it is, that they're not even trying to distinguish actual gang membership or even figure out if a tattoo is a gang tattoo or not. And due process, people are being subjected to hearings like en masse with I think hundreds of people. So the government's making no effort. It kind of has this like broad policy that makes it look like it's taking these steps against gangs. But I think the evidence shows that it's not trying to correct that error. So I don't think the evidence supports that would happen. So bottom line, your position is that even if we take as true McNamara's statement that this is happening, that that compels, it's a general statement, that that compels a decision that the BIA's findings with respect to your client have to be basically ignored. Is that correct? Yes. I think in past cases like this court, in cases like Bromfield and Camalthus, has held that when a petitioner shows they have certain characteristics, that's strong evidence that they would be tortured. So everybody in El Salvador that has your client's characteristics can get into the United States based on a CAT claim, based on a Dr. McNamara declaration, is that right? No, Your Honor. We don't think so. We think the question of eligibility for CAT is a separate question. And here, Mr. GC has been misidentified as a gang member in El Salvador in the past. I'm saying something with the identical position. To me, it's a startling position because you can involve thousands and thousands of people because a lot of people in El Salvador have tattoos. And but you seem to be suggesting that everybody in the country could get CAT benefits based on what you're saying. Is that right? We don't agree with that because Mr. GC has several characteristics. I think I mentioned this, but... The people who have the same characteristics, they could all get CAT benefits. I think if they're being deported from El Salvador and they have U.S. criminal convictions, the evidence suggests that they are very likely to be detained and imprisoned by the Salvadoran government. Here, I think the court doesn't need to reach that. If the court I see is not convinced that the record compels a contrary conclusion, here the agency should have considered that evidence. The agency did not point to any evidence supporting its finding that people who aren't actually members would not be targeted.  Your time is up. Let me ask my colleagues whether either has a question. Thanks to you all for your argument. We appreciate it. The case of ECG v. Garland is submitted and the court stands adjourned for the day.
judges: Tymkovich, SMITH, BUMATAY